# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERIC BORCIK | CIVIL ACTION |
| VERSUS | NO. 13-06212 |
| CROSBY TUGS, LLC | SECTION "L" (2) |

## ORDER & REASONS

Before the Court are Plaintiff's Motion for Reconsideration, R. Doc. 130, and Defendant's Motion for Judgment as a Matter of Law or Alternatively, Motion for Summary Judgment, R. Doc. 135. Having considered the parties' arguments and the applicable law, the Court now issues this order and reasons.

**I.   BACKGROUND**

In 2013, Eric Borcik brought suit against his employer, Crosby Tugs LLC, under the Louisiana Environmental Quality Act ("LEQA") and the Louisiana Environmental Whistleblower Act ("LEWA"), claiming that he had been terminated in retaliation for reporting that his captain aboard the M/V Nelda Faye instructed him on multiple occasions to illegally dump waste oil into navigable waters. *Borcik v. Crosby Tugs, LLC*, No. 13-06212, 2015 WL 1525141, at *1 (E.D. La. April 2, 2015).

Mr. Borcik began his employment with Crosby Tugs in 2008 aboard the M/V Carl Joseph but was soon transferred to the M/V Mr. Farrell. In 2010, while aboard the M/V Mr. Farrell, Mr. Borick complained to the company's safety department about various concerns of safety violations occurring aboard the M/V Mr. Farrell. Mr. Borcik was then transferred to the M/V Nelda Faye. Mr. Borcik alleged that during his three years aboard the M/V Nelda Faye, his captain instructed

him to dump waste oil overboard, and that he addressed these instances on three occasions in letters to the company's safety department and human resources department. Mr. Borcik additionally alleged that in response to his complaints, his captain increased the length of his shifts and gave him more strenuous tasks than other employees. Further, Mr. Borcik contends that after speaking to a human resources manager about his concerns, he was transferred twice and then terminated, allegedly in retaliation for reporting the illegal dumping. Crosby Tugs maintains that the termination was non-retaliatory, but rather resulted from Mr. Borcik's insubordinate attitude. Borcik brought suit seeking damages for lost wages, mental pain, humiliation, embarrassment, medical expenses, loss of enjoyment of life, and costs.

Mr. Borcik brought his claim under the LEWA, which provides protection for an employee who discloses or reports a practice or activity of his/her employer that the employee believes to be a violation of an environmental law. In particular, the act prohibits an employer from acting in a retaliatory manner towards an employee who, in good faith, "discloses or threatens to disclose, to a supervisor or public body an activity, policy, [or] practice of the employer… that the employee reasonably believes is in violation of an environmental law, rule, or regulation." La. Rev. Stat. § 30:2027. At trial, the jury was instructed that to succeed in a LEWA claim, a plaintiff must demonstrate that he (1) acted in good faith; (2) reported or threatened to report an environmental violation to a supervisor; (3) reasonably believed the activity, policy, or practice to be a violation of an environmental law; and (4) were retaliated against by his employer because of the report. *Borcik v. Crosby Tugs, L.L.C.*, 656 Fed. App'x 681, 682-83 (5th Cir. 2016). Because Louisiana law allows recovery only if a plaintiff demonstrates that the report of violations were made in good faith, the outcome of this case hinges on the definition of that term.

The definition of good faith as it applies to the LEWA and LEQA was an issue of first impression when the case came before the district court. Mr. Borcik and Crosby Tugs proposed two different definitions of the term for the jury instruction. *Id.* at 683. Mr. Borcik proposed that "a finding of good faith means that the plaintiff had an honest belief that an environmental violation occurred." In contrast, Crosby Tugs urged the district court to interpret good faith to mean that an employee "had no intent to seek an unfair advantage or harm another party in making his report. . . ." The district court ultimately delivered a jury instruction that combined elements of both propositions, defining good faith as "an honest belief that an environmental violation occurred and that [the plaintiff] did not report it either to seek an unfair advantage or to try to harm his employer or another employee." During closing argument, Crosby Tugs emphasized the malice element by stressing that Mr. Borcik intended to harm his supervisor and told the jury that "if you conclude that's why he made this complaint, to get an unfair advantage, or to harm Captain LeBlanc or anyone else, then you've got to dismiss this case." The jury ultimately decided that while Mr. Borcik reasonably believed the illegal dumping to be a violation of an environmental law, he did not make the report in good faith. Consequently, the district court entered a judgment for Crosby Tugs. Mr. Borcik appealed the district court's decision, arguing that the court erred by ill-defining good faith in the jury instruction.

## II. THE FIFTH CIRCUIT

Considering the case on appeal, the Fifth Circuit determined that it could not deduce the meaning of good faith due to a lack of guidance from the Louisiana Supreme Court and other Louisiana courts. The court briefly discussed *Overton v. Shell Oil Co.*, where they considered two alternative definitions of good faith in an environmental whistleblower case. However in that case, the court did not adhere to either definition and merely held that they could not find that the trial court had erred in determining that good faith existed. *Id.* at 684 (citing *Overton v. Shell Oil Co.*,

937 So.2d 404 (La. App. 4 Cir. 7/18/06). The court further noted that the definition of good faith varies from state to state. *Id.* In Texas, for example, it "encompasses any situation in which an employee has a reasonable belief that a law has been broken," but other states apply a narrow definition that "excludes reports made at least partially with the ulterior motive of harming their employer or fellow employees." *Id*. at 684. Due to the ambiguity, the court noted that it was not prepared to define good faith without further guidance, and certified the following question to the Louisiana Supreme Court: "What is the meaning of 'good faith' as that term is used in the Louisiana Environmental Quality Act, Louisiana Revised Statutes 30:2027?"

## III. LOUISIANA SUPREME COURT

### A. Louisiana Supreme Court Analysis

Answering the certified question from the Fifth Circuit, the Louisiana Supreme Court held that for the purposes of the LEQA and LEWA, good faith "means an employee is acting with an honest belief that a violation of an environmental law, rule, or regulation occurred." *Borcik v. Crosby Tugs, L.L.C*., No. 2016-CQ-1372, 2017 WL 1716226, at *1 (La. May 3, 2017). The Louisiana Supreme Court began by noting that it is imperative to search for the legislative intent when discussing a law's interpretation. *Id.* at *3. Consequently, the court first analyzed the plain text of the statute and concluded that the language of the LEQA did not define "good faith" for the purposes of the statute. The ambiguity of the term, the court noted, was evidenced by the objection of both parties to the proposed definitions and the Fifth Circuit's hesitancy to define the term itself. *Id.* at *3.

Next, the court turned to the secondary rules of statutory interpretation, attempting to discover the legislative purpose of the acts. The court began by discussing Article IX § 1 of the Louisiana Constitution, which provides that

the natural resources of the state, including air and water, and the healthful, scenic, historic, and aesthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

*Id*. at *3 (citing La. Const. art. IX § 1). The court noted that this constitutional directive is reflected in the statute itself and in the legislative statement made at the time of its enactment. *Id*. at *3. According to the legislative history, environmental protection is "a matter of critical state concern," a sentiment echoed in the statute's text itself, which asserts that governmental regulation is imperative to the maintenance of a healthy and safe environment. *Id.* Promoting this goal, the act includes a series of comprehensive policies aimed at preserving and protecting Louisiana's unique environment. *Id*. The whistleblower statute in particular is derived from this same constitutional mandate and promotes environmental protection by shielding "employees from retaliation and other adverse employment actions for reporting possible environmental violations." *Id.* at *6-7.

The Louisiana Supreme Court continued to discuss Mr. Borcik and Crosby Tug's competing definitions and ultimately equated good faith with an honest belief in the illegality of the reported activity because such a definition best promotes the purpose of the act itself and the constitutional mandate of environmental protection. *Id.* In addition, this definition balances the interests of the state, industry, and employees by promoting reporting of environmental violations while protecting employers from reports made without the requisite honest belief. *Id.* at *4. The court found additional support for its determination in the broad interpretation of the LEQA utilized in *Cheramie v. J. Wayne Plaisance, Inc.*, in which the whistleblower statute was read to encompass a variety of environmental regulations, including wildlife protection. *Id.* at 4 (citing

*Cheramie v. J. Wayne Plaisance, Inc.*, 595 So.2d 619 (La. 1992)). The court also discussed *Wichita County v. Hart*, an opinion from the Texas Supreme Court that applied a broad definition of good faith to the Texas Whistleblower Act. *Id.* (citing *Wichita County v. Hart*, 917 S.W.2d 779 (Tex. 1996)).

In contrast, the court hypothesized that the narrow definition proposed by Crosby Tug's would lead to absurd results if practically applied. *Id.* at *5. While Crosby Tugs argued that a lack-of-malice standard would promote environmental protection while prohibiting employees acting with malice from being protected, the court noted that such a standard would seriously prejudice an employee who was not staunchly in the good graces of his employer. *Id.* As the court notes, "an employee who likes his employer and an employee who does not like his employer would be treated differently for reporting an identical violation." *Id.* Additionally, the Court demonstrated that requiring proof of lack of malice would seriously curtail the number of violation reports. *Id.* Because the purpose of the statute is to promote environmental protection by encouraging reports of violations, a lack-of-malice standard that dis-incentivizes reports would be counter-productive to the goals of the legislation. *Id.*

Finally, to assuage fears that a broad definition risks promoting baseless claims of environmental violations made by disgruntled employees, the court notes that the language of the act contains an objective standard that requires a plaintiff to reasonably believe that their employer's practice actually violates a rule. *Id.* at *6. Additionally, the act expressly withholds protection from employees who engage in prohibited environmental activities without direction from their supervisor. *Id.* These two provisions, the Court asserts, serve as safeguards against fabricated claims. *Id.*

B.   Holding

Ultimately, the Louisiana Supreme Court provided a clear definition for "good faith" as it applies to the LEQA and LEWA when it held that an employee's malice or desire to harm his employer by reporting an environmental violation is irrelevant to a whistleblower claim. *Id*. at *4-5. Good faith, the court found, requires only a demonstration that a plaintiff honestly believed that his employer violated an environmental law. *Id*. at *1. Such a broad definition of good faith is the most appropriate way of upholding the Act's purpose of environmental protection, as derived from the Louisiana Constitution's mandate. *Id*. at *4. Unlike the district court's jury instruction, which included a requirement that the plaintiff did not mean to cause any harm towards his employer, the Louisiana Supreme Court defined good faith as solely the honest belief that an environmental violation has occurred, such that a whistleblower's sentiment towards his employer or superior officers is irrelevant to his claim of protection under the statute. *Id*. at *1.

The Fifth Circuit remanded the case with instructions to conduct further proceedings in accordance with the Fifth Circuit's opinion.

IV.   **PENDING MOTION**

After the case was remanded, Defendant requested a status conference. R. Doc. 119. The Court held a status conference on September 11, 2017 and discussed how to move the case forward. R. Doc. 129. At this conference, the Court ordered the parties to confer and set a schedule for submitting Defendant's motion for judgment as a matter of law. R. Doc. 129. Subsequently, Plaintiff filed this motion. R. Doc. 130. Additionally, Defendant has filed its Motion for Judgment as a Matter of Law or Alternatively, Motion for Summary Judgment. R. Doc. 135.

## V. LAW & ANALYSIS

### A. Federal Rule of Civil Procedure 50(b)

Rule 50 provides that when the opposing party has been fully heard on an issue, the other party may move for a judgment as a matter of law. Fed. R. Civ. P. 50(a). Judgment as a matter of law is appropriate with respect to a given issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." Fed. R. Civ. P. 50(a)(1). "This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict." *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). In applying this standard, "the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party; the court may not make credibility determinations or weight the evidence, as those are jury functions." *Id.*

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged . . . .

### B. Discussion

First, the Court considers Defendant's motion styled under Rule 50. When first filed during the jury trial in this matter, the Court, consistent with the Advisory Committee's notes following Rule 50(b), took Defendant's motion for judgment as a matter of law under advisement and submitted the matter to the jury.[1] After the verdict was announced, the Court

---

[1] "Often it appears to the court or to the moving party that a motion for judgment as a matter of law made at the close of the evidence should be reserved for a post-verdict decision. This is so because a jury verdict for the moving party moots the issue and because a preverdict ruling gambles that a reversal may result in a new trial that might have been avoided. For these reasons, the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence, and it is not inappropriate for the moving party to suggest such a postponement of the ruling until after the verdict has been rendered." Fed. R. Civ. P. 50(b) advisory committee's not to 1991 amendment.

denied Defendant's motion for judgment as a matter of law as moot. R. Doc. 115 at 79. Because the jury found for the Defendant, it did not make sense for the Defendant to renew the motion at that time. However, Defendant's existing renewal of the motion is not timely because it has been renewed more than 28 days after the entry of judgment.[2] Therefore, Defendant's motion must be considered as a motion for summary judgment under Rule 56.

Before this matter went to trial, the Court denied Defendant's motion for summary judgment because there were issues of material fact that required consideration by a jury. R. Doc. 70. At the jury trial the Court gave an erroneous jury instruction. The issues of material fact have not changed between the Court's denial of the first motion for summary judgment and filing of Defendant's current motion. Therefore, it is only proper that the Court send the matter back to a jury with a proper instruction.

## VI. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's motion for reconsideration, R. Doc. 130, is **GRANTED**. The Court will set a scheduling conference with the parties to set dates for a new trial.

**IT IS FURTHER ORDERED** that Defendant's motion for judgment as a matter of law or alternatively, motion for summary judgment, R. Doc. 135, is **DENIED**.

New Orleans, Louisiana, this 7th day of November, 2017.

**ELDON E. FALLON**
United States District Judge

---

[2] At first blush, it seems unfair to fault Defendant for not timely filing the motion because he won the case. However, on further consideration, if the Court had granted Defendant's motion for judgment as a matter of law when first filed, the Court would have been applying an improper standard.

9